# EXHIBIT A

```
 1

 2    IN THE CIRCUIT COURT OF THE 11TH JUDICIAL
      CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA
 3    PROBATE DIVISION
      -------------------------------------------X
 4

 5    IN RE:  THE ESTATE OF ROBERT M. ADELMAN

 6    CASE NO. 2016-001314-CP-02

 7

 8    -------------------------------------------X

 9

10               DATE:  September 21, 2017

11               TIME:  10:34 a.m.

12

13          DEPOSITION of SUSAN HALL, taken

14    by the Attorneys for the Estate of Robert

15    Adelman, pursuant to a Discovery

16    Proceeding, held at the offices of Carr,

17    200 Park Avenue, New York, New York 10166,

18    before Diane Buchanan, a Notary Public of

19    the State of New York.

20

21

22

23

24

25
                           1
```



Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4   GRAY ROBINSON, P.A.
        Attorney for SAMANTHA REAY, PERSONAL
 5      REPRESENTATIVE OF THE ESTATE OF ROBERT
        ADELMAN
 6      333 S.E. Second Avenue, Suite 3200
        Miami, Florida 33131
 7      BY:  KAREN L. STETSON, ESQ.
        Florida Bar #:  742937
 8      Karen.stetson@gray-robinson.com
 9
10
     TABLES LAW GROUP, P.A.
11      Attorneys for SAMANTHA REAY, PERSONAL
        REPRESENTATIVE OF THE ESTATE OF ROBERT
12      ADELMAN
        2600 SW 3rd Avenue, Suite 350
13      Miami, Florida 33129
        BY:  RYAN TABLES, ESQ.
14      Florida Bar #:  57599
        rtables@gmail.com
15
16
                  *      *      *
17
18
19
20
21
22
23
24
25
                        2
```

Page 3

```
 1                    S. HALL
 2   S U S A N    H A L L , called as a witness,
 3   having been first duly sworn by a Notary
 4   Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION BY
 7   MS. STETSON:
 8        Q.   Please state your name and
 9   address?
10        A.   Susan Hall, 115 East 34th
11   Street, Number 844, New York, New York
12   10016.
13        Q.   Now, have you ever had your
14   deposition taken before?
15        A.   Yes.
16        Q.   When was that?
17        A.   19 -- gosh, somewhere in the
18   mid-'90s.
19        Q.   And just the one time before?
20        A.   Yes.
21        Q.   And was that in connection with
22   a litigation, a lawsuit?
23        A.   Yes.
24        Q.   What was that lawsuit about?
25        A.   I had been run over by a truck.
                        3
```

Page 4

```
 1                    S. HALL
 2        Q.   It was a car accident case?
 3        A.   Not car because it was a
 4   physical.
 5        Q.   Automobile, whatever.  It was
 6   an accident case, right?
 7        A.   Yes.
 8        Q.   All right.  So I just wanted
 9   to, before we start, just give you a few
10   sort of rules of how this is being
11   conducted.  You need to answer my questions
12   to the best of your ability.  You
13   understand that?
14        A.   Yes.
15        Q.   Okay.  And you need to answer
16   all questions verbally --
17        A.   Yes.
18        Q.   -- audibly for the benefit of
19   the court reporter instead.  You can't just
20   shake your head or whatever.
21        A.   Yes.
22        Q.   So when we ask questions you
23   need to answer verbally.  And if you don't
24   understand my question, you can ask me to
25   clarify some aspect of the question that
                        4
```

Page 5

```
 1                    S. HALL
 2   you don't understand.  But if you do
 3   understand the question, you need to answer
 4   it fully to the best of your knowledge.  If
 5   you don't know the answer, we don't want
 6   you to guess, we don't want you to
 7   speculate.  You are at all times free to
 8   indicate you don't know the answer to a
 9   particular question.  You understand that?
10        A.   Yes.
11        Q.   Now, you understand what the
12   purpose of today's deposition is?
13        A.   Well, it's never been quite
14   stated, but I believe this has to do with
15   my assertion that I hold joint copyrights
16   with the deceased in six properties.
17        Q.   Okay, so let's start with that:
18   What are the six properties that you claim
19   to hold joint copyright?
20        A.   On and Off the Street Down
21   Home, Gentlemen of Leisure, Ladies of the
22   Night, Street Smart and Out of Left Field.
23        Q.   Gentlemen of Leisure, Street
24   Smart, Ladies of the Night and what was the
25   last one?
                        5
```

Page 54

```
 1                   S. HALL
 2   photographs if they wanted to?
 3        A.   No.
 4        Q.   Why not?
 5        A.   They weren't given those
 6   rights.
 7        Q.   I just asked you:  These option
 8   agreements, were they prohibited from using
 9   the photographs?
10        A.   I don't believe they were
11   prohibited.
12        Q.   So, again, do you say they
13   couldn't use it?
14        A.   I'm sorry, I'm not really -- I
15   think step by step I was approached to
16   provide the story I was going to work on
17   and did some work for the Dino De
18   Laurentiis, I did some work on the Max
19   Palevsky and I always worked with Woodie
20   King.  And it was a story and nobody wanted
21   to put those photographs up in the film.
22   But how that would have worked, I don't
23   know.  Everybody is terrified of Bob they
24   probably would have gotten a second
25   agreement or something.
                        54
```

Page 55

```
 1                   S. HALL
 2        Q.   Just hypothetically if these
 3   agreements provided for the use of the
 4   books, let's just say these agreements said
 5   we get to use these books --
 6        A.   They get to use the story.
 7        Q.   I'm talking, okay.
 8             Let's say these agreements
 9   which we don't have in front of us provide
10   for the use of the books, that that's what
11   they say and that they don't specify text
12   only, photos only.
13             Then would you agree with me
14   that they would then have the right to use
15   whichever they wanted regardless of
16   whatever your understanding might be of
17   what they intended to do, pointing about if
18   the agreement gave them the right to use
19   the book, they could use all parts of the
20   book unless the agreement said otherwise?
21   Isn't that true or you don't really know
22   because you are not a lawyer?
23        A.   I don't really know.
24        Q.   Okay, fair enough.
25             Let's go back to the
                        55
```

Page 56

```
 1                   S. HALL
 2   circumstances under which -- because it was
 3   very fuzzy to me the circumstances under
 4   which you first became aware that Bob did
 5   not agree with your position on joint
 6   ownership, all right.
 7             Now, how did you become aware
 8   of that?  Was that, I think you said
 9   that -- I'm trying to pin this down a
10   little bit.  Was it in connection with
11   receiving one of these film options or was
12   there a particular deal or a publication or
13   something that happened that kind of, you
14   know, brought it to light?
15        A.   I decided that I wanted to
16   clear the relationship up.
17        Q.   Was it unclear at that point?
18        A.   I felt it was unclear.  I
19   cannot tell you what the precipitating
20   event was.
21        Q.   So sometime in the early '90s
22   you took it upon yourself to try to get
23   clarity and that was with respect to all of
24   the books at issue, right, all six or
25   whatever, right?
                        56
```

Page 57

```
 1                   S. HALL
 2             At that point in time you felt
 3   there was a lack of clarity in the
 4   relationship, in the legal relationship if
 5   you will, and specifically with regard to
 6   the copyright or more than just the
 7   copyrights?
 8        A.   It was focused on the
 9   copyright.
10        Q.   So at that point recognizing
11   there was a lack of clarity and wanting to
12   get clarity, you what, approached Bob about
13   the copyrights; how did you go about that?
14        A.   I hired a lawyer.  And the
15   small claims is the end of that process,
16   not the beginning.
17        Q.   We will get to that, okay.
18             So you hired a lawyer because,
19   you know, you recognized there was a lack
20   of clarity and wanted to get it cleared up?
21        A.   I also was somewhat unclear and
22   I wanted to have -- as I have done in the
23   past year, I wanted to have -- really
24   understand why what I thought I understood
25   but was battered down on was really the
                        57
```

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
561.822.4626
www.olenderlegal.com
Worldwide Coverage

```
                                       Page 58
 1                  S. HALL
 2   legal, the legal matter.
 3       Q.    So at that time, what lawyer
 4   did you hire?
 5       A.    Judith Gobim, G-O-B-I-M.  She
 6   was at Patterson Belknap.
 7       Q.    You made reference to the small
 8   claims matter.  Did you have counsel
 9   represent you for the small claims matter?
10       A.    Judith and I -- they negotiated
11   for a year and a half.  I didn't negotiate;
12   Judith did.
13       Q.    What was she trying to
14   negotiate on your behalf with Bob?
15       A.    To clear up the joint
16   copyright, which she examined the records
17   on and thought was clear.
18       Q.    And Bob didn't agree with that?
19       A.    No.
20       Q.    Was Bob represented by counsel
21   during those representations?
22       A.    God only knows.  His
23   relationship with John Horan is a hornet's
24   nest.
25       Q.    All right.  Well, you can only
                        58
```

```
                                       Page 59
 1                  S. HALL
 2   answer what you do know.
 3             My question is:  During
 4   this -- I'm sorry, again, did you say
 5   Judith Gobim negotiated with Bob over a
 6   two-year period?
 7       A.    Yes.
 8       Q.    And during that two-year
 9   period, as far as know, Judith dealt
10   directly with Bob in the negotiations or do
11   you not know one way or the other?
12       A.    I don't know.
13       Q.    That's fine.  So either she
14   negotiated with Bob directly or a
15   representative of his, correct?
16       A.    Probably John, yes.
17       Q.    Can you tell me anything about
18   those negotiations what anybody offered to
19   do or were trying to do?
20       A.    I know what we offered at the
21   end because I saw papers on it.  We thought
22   it was brilliant to divide the properties
23   entirely so that we wouldn't have to deal
24   with each other at all anymore.
25       Q.    Can you tell me what you mean
                        59
```

```
                                       Page 60
 1                  S. HALL
 2   by "divide the properties"?
 3       A.    I would take the entire
 4   copyright, and I think I asked for
 5   Gentlemen of Leisure and Out of Left Field,
 6   and gave him Down Home and Ladies of the
 7   Night.  And the two children's books, we
 8   just split.  Street Smart and On and Off
 9   the Street are children's books.
10       Q.    When you say "split," in other
11   words, each take one?
12       A.    Yes.
13       Q.    So basically you would each end
14   up with full copyright of three books,
15   three books?
16       A.    Yes.
17       Q.    And I assume that Bob and/or
18   his representative did not agree with that?
19       A.    Bob didn't agree with anything
20   ever.
21       Q.    But, I mean, this proposal Bob
22   didn't agree to?
23       A.    It was the last one before we
24   started to go to small claims, yes.
25       Q.    This proposal, I want to stick
                        60
```

```
                                       Page 61
 1                  S. HALL
 2   on this proposal, do you know what Bob's
 3   objection was to this proposal or any of
 4   the proposals that you made?
 5       A.    Bob I believe -- and I hadn't
 6   talked to him for 25 years before except
 7   two or three words before he died.  But
 8   prior to that when I was working with him
 9   and we had somewhat of a civilized
10   interface, Bob really deeply felt that
11   these were his photographs and that was
12   very clear.  And he wasn't to divide -- to
13   divide the books would have been to
14   alienate him from something he cared very
15   much about irregardless of, you know, what
16   was right or agreed or anything else.  And
17   I did see that.
18       Q.    All right.  So his position and
19   I guess you're saying that it was --
20       A.    -- emotional.
21       Q.    It was an unfailing and
22   consistent position, if you will, that the
23   photographs were his and he wanted to be
24   the only one to make decisions about
25   selling the photos, displaying the photos,
                        61
```



Page 62

```
 1                  S. HALL
 2   how they were used, et cetera?
 3       A.    Making money on the photos.
 4       Q.    He wanted to be in charge of
 5   the photos for whatever purpose, right?
 6       A.    Yes.
 7       Q.    So that lasted over a two-year
 8   period in the early '90s and I think you
 9   said it culminated -- I don't intend to put
10   words in your mouth, it culminated then in
11   the small claims suit; is that correct?
12       A.    It didn't -- I mean, culminate
13   I think is the wrong word.  Do you want to
14   pick another one?
15       Q.    Sure.  It led to it?
16       A.    We gave up negotiating because
17   you don't negotiate with Bob.
18       Q.    Your negotiations failed, you
19   already indicated was Bob's doing that.
20   They failed because you were willing to do
21   X, he didn't want to do that.  All right,
22   that's fine.  Then you decided to proceed
23   with a lawsuit; is that right?
24       A.    Judith suggested was the simple
25   way to do is go after it item by item in
                        62
```

Page 63

```
 1                  S. HALL
 2   small claims as a contract issue.
 3       Q.    Is that what you proceeded to
 4   do?
 5       A.    Yes.
 6       Q.    And did you file more than one
 7   small claims action since you were --
 8       A.    I don't think so.
 9       Q.    I have to get the question out.
10             Since your plan was to do it
11   book by book, did you file a lawsuit as to
12   each book?
13       A.    No.
14       Q.    So what did you do?
15       A.    We started with a case that
16   Judith had papers on from Macmillan where
17   Bob used photographs where we had a joint
18   copyright in on a book that was never
19   published because Bob was fighting with
20   Macmillan.  He got $40,000.  We had all of
21   the papers.
22       Q.    Was that a book he was doing
23   with Ann Beattie.
24       A.    Yes.
25       Q.    So that one seemed like the
                        63
```

Page 64

```
 1                  S. HALL
 2   likely sort of first candidate because your
 3   lawyer had evidence of him actually using
 4   the photos separate and apart from the
 5   book, correct?
 6       A.    Yes.
 7       Q.    I have to keep doing that
 8   because she has to get it down.
 9       A.    All right.
10       Q.    But she didn't file it for you,
11   you weren't represented by a lawyer?
12       A.    No, I was on my own.  We
13   stopped.  I spent more money than I had
14   already.
15       Q.    Okay.  So you decided to go on
16   your own and file a small claims action?
17       A.    She suggested it.
18       Q.    I understand.  And who actually
19   drafted the papers?
20       A.    I did it.
21       Q.    I don't have the actual
22   complaints.  Do you have that?
23       A.    I can get it, if you want me
24   to.
25       Q.    Was it handwritten?
                        64
```

Page 65

```
 1                  S. HALL
 2       A.    I have no idea.
 3       Q.    You don't recall?
 4       A.    I don't recall.
 5       Q.    But you do recall you were the
 6   one that actually prepared the complaints
 7   as opposed to your lawyer?
 8       A.    I am quite sure.
 9       Q.    What was the outcome of that
10   case?
11       A.    John came into that case,
12   Horan, and I mean he -- I remember him
13   coming to court and they persuaded the
14   judge that it was a federal matter and not
15   a contract matter.  And I was exhausted.
16       Q.    The judge agreed --
17       A.    The judge agreed with them,
18   yes.
19       Q.    -- that it was a federal
20   matter?
21       A.    Yes.
22       Q.    And then once that occurred,
23   did you file anything in federal court
24   after that?
25       A.    No.
                        65
```

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
561.822.4626
www.olenderlegal.com
Worldwide Coverage

Page 66

1             S. HALL
2     Q.   What was the reason?
3     A.   I had no money left.  I spent
4  it all on the lawyers for two years.  And
5  I -- you know, with Bob also, I mean, he's
6  never going settle, that became very clear.
7  And endless litigation in federal court was
8  not something I looked forward to.
9          MS. STETSON:  I would like to
10     take a two-minute break.
11         (Whereupon, a luncheon recess
12     was taken from 12:10 p.m. to 1:09
13     p.m.)
14         MS. STETSON:  For the record,
15     we took a break during which Ms. Hall
16     went through a bunch of documents
17     that she brought with her today to
18     determine if there were any documents
19     in addition to those that were
20     previously produced in this case that
21     she intends to use at the evidentiary
22     hearing.  And she has produced
23     several pages, which we will have
24     copied and appended for purposes of
25     identification as Estate Exhibit 1.
                        66

Page 67

1             S. HALL
2     It's a composite exhibit that exhibit
3     is five pages.
4         (Estate Exhibit 1, Five-page
5     composite Document marked for
6     identification, as of this date.)
7     Q.   Do you have an objection to my
8  putting a sticker on it?
9     A.   If you don't mind, what is on
10  the back of it?
11         It's not personal, so I don't
12  care.
13     Q.   So let's just talk about a
14  these additional documents you produced.
15         And, by the way, based on all
16  of our conversations and our agreement,
17  et cetera, at this juncture any additional
18  evidence, documentary evidence, that you
19  attempt to put on at the evidentiary
20  hearing that you have not provided us at
21  this point, we will object to.  You
22  understand that, correct?
23     A.   Yes.
24     Q.   Now, looking at the first page,
25  this appears to be a printout from the
                        67

Page 68

1             S. HALL
2  public records of the copyright office.
3  And what is the significance of this
4  document as far as you are concerned?
5     A.   All of our copyrights were
6  taken out prior to the period when this
7  copyright was taken out.  In other words,
8  they are not online, you can't find them
9  there.  You have to go to the Library of
10  Congress.  I think it's worth investigating
11  why Bob took out a copyright notice on the
12  book Gentlemen of Leisure in his name
13  alone, period.
14     Q.   So this indicates that
15  Mr. Adelman had a registration in his name
16  only for Gentlemen of Leisure, correct?
17     A.   Yes.
18     Q.   Now, you mentioned just now
19  that this exhibit that we were just talking
20  about for Gentlemen of Leisure was after
21  the other copyrights had already been
22  registered, is that what you are saying?
23     A.   Right.
24     Q.   With regard to the six books at
25  issue, who actually, you know, did those
                        68

Page 69

1             S. HALL
2  registrations; who actually filled out the
3  applications, if you know?
4     A.   To the best of my recollection,
5  and if you look at it you can see my
6  handwriting, Viking Press did.  I did
7  Street Smart, Gentlemen of Leisure, Down
8  Home, Ladies of the Night.  And Two
9  Continents did Out of Left Field.  That's
10  to the best of my recollection.
11     Q.   Two Continents did Left Field?
12     A.   Yes.
13     Q.   With regard to the
14  registrations that you prepared, did you at
15  any time show Mr. Adelman those
16  applications?
17     A.   Yes.
18     Q.   Did he sign off on those
19  applications?
20     A.   Yes.
21     Q.   Did he actually sign them?
22     A.   No, but he said he knew I was
23  doing it and that was my job.
24     Q.   And with regard to Viking Press
25  and Two Continents, do you know whether he
                        69

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
561.822.4626
www.olenderlegal.com
Worldwide Coverage